593-06/GMV/PLS
FREEHILL HOGAN & MAHAR LLP
Attorneys for Plaintiff
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax

Gina M. Venezia (GM 1551)
Pamela L. Schultz (PS 0335)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

PIGASOS NAVIGATION CO. LTD.,

                             Plaintiff,

        -  against –

FAR EAST INTERNATIONAL PETROLEUM
COMPANY LLC a/k/a FEIPCO,

                             Defendant.
-----------------------------------------------------------------x

**07 CIV**

**VERIFIED COMPLAINT**

Plaintiff, PIGASOS NAVIGATION CO. LTD. ("PIGASOS"), by its attorneys Freehill,

Hogan & Mahar, LLP, as and for its Verified Complaint against Defendant FAR EAST

INTERNATIONAL PETROLEUM COMPANY LLC a/k/a FEIPCO ("FEIPCO") alleges upon

information and belief as follows:

    1.   This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure in that it involves a claim for the breach of a maritime contract

of charter party. This case also falls under this Court's admiralty and maritime jurisdiction

pursuant to 28 U.S.C. §1333. Jurisdiction is also proper pursuant to the Court's federal question

jurisdiction pursuant to 28 U.S.C. §1331. Federal jurisdiction also exists because the action

arises under the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards at 9 U.S.C. §201 *et seq.* and/or the Federal Arbitration Act, 9 U.S.C. §1 *et seq.*

2.    At all times relevant hereto, Plaintiff PIGASOS was and still is a foreign business entity duly organized and existing under the laws of Liberia with an address at 80 Broad Street, Monrovia, Liberia.

3.    At all times relevant hereto, FEIPCO was and still is a foreign business duly organized and existing under the laws of a foreign country with an office and place of business at Salam Centre, Al-Gardens, P.O. Box 2620, Amman 11921 Jordan.

4.    On or about October 1, 2003, Plaintiff PIGASOS as owner and Defendant FEIPCO as charterer entered into a maritime contract of charter party for a period of six months. A true and correct copy of the charter party is attached as **Exhibit A.**

5.    Under the charter party, Charterers were to pay for the use and hire of the vessel at a rate of USD $10,000 per day with hire being paid 30 days in advance and the first hire payment due three days prior to delivery of the vessel.

6.    The vessel was duly delivered and tendered into service under the charter on or about October 28, 2003. A true and correct copy of the Certificate of Delivery is attached as **Exhibit B.**

7.    Despite due demand, FEIPCO failed to pay amounts due and owing to PIGASOS under the charter party, including hire and bunker expenses.

8.    On November 19, 2003, PIGASOS placed FEIPCO on notice of its intent to withdraw the vessel if payment of hire was not forthcoming. (**Exhibit C**). Although FEIPCO

represented it intended to make payment to PIGASOS (**Exhibit D**), FEIPCO failed to pay the amounts due and outstanding under the charter.

9.   On December 2, 2003, PIGASOS exercised its right under the charter party to withdraw the vessel because the full amount due and outstanding under the charter had not been paid.

10.   Plaintiff PIGASOS has fulfilled all obligations required of it under the charter party.

11.   The charter party provides that it is to be governed by English law and all disputes between the parties are to be resolved by arbitration in London or litigation before the English Courts, which rights are reserved.

12.   Pursuant to English law, including but not limited to Section 63 of the English Arbitration Act of 1996, costs including attorney fees, arbitrators' fees, disbursements and interest are recoverable as items of claim.

13.   This action is brought to obtain jurisdiction over FEIPCO and to obtain security in favor of Plaintiff PIGASOS in respect to its claims against FEIPCO under the charter, including but not limited to damages for the following:

> a.   Charter hire for the period from October 28 to November 27, 3003, in the amount of $294,500;
>
> b.   Bunker consumption in the amount of $15,500.00;
>
> c.   Cost of boats for Charterers' inspection in the amount of $722.00

          d.  Charter hire for the period from November 27, 2003, to December 2, 2003 (the date the vessel was withdrawn from Charterer's service) in the amount of $52,500.

for a total of $ 363,220.00.

14. This action is further brought to obtain security for any additional sums to cover Plaintiff's actual attorney fees and costs incurred to date in pursuit of its claims against FEIPCO in the amount of $32,500.00 (€ 25,000), and Plaintiff's anticipated attorney fees and costs in pursuit of its claims against FEIPCO estimated to be USD $70,000.00.

15. This action is further brought to obtain security for any additional sums to cover interest at a rate of 4% from the time payment was due in 2003 until the entry of judgment or an arbitration award in 2 years from filing estimated to be USD $72,645.00..

16. Plaintiff estimates, as nearly as can be computed, the total amount of its claim which is sought to be attached pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims by PIGAOS against Defendant in the sum of $538,367.00.

17. Upon information and belief, and after investigation, the Defendant cannot be "found" within this district for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff is informed that Defendant has, or will shortly have, assets within this District comprising of, *inter alia*, cash, funds, credits, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendant (hereinafter, "ASSETS"), moving through banking institutions including but not limited to ABN Amro, American Express Bank, Arab Bank, BNP Paribas, Bank of America, Brown Brothers Harriman, Citibank,

Deutsche Bank Trust Co., Habib American Bank, HSBC, HSBC USA Bank NA, JPMorgan Chase Bank, Mashreqbank, Standard Chartered Bank, The Bank of New York, Wachovia Bank, and/or other institutions or such other garnishees who may be served with a copy of the Process of Attachment issued herein.

WHEREFORE, Plaintiff PIGASOS NAVIGATION CO. LTD. prays:

a.     That process in due form of law according to the practice of this Court in admiralty and maritime jurisdiction issue against the Defendant, citing it to appear and answer under oath all and singular the matters alleged, failing which a default will be taken against it;

b.     That since Defendant cannot be found within this District pursuant to Supplemental Rule B, that all assets of Defendant up to and including the sum of USD $538,367.00 may be restrained and attached, including but not limited to any cash, funds, credits, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire, sub-charter hire, and/or other assets of, belonging to, due or for the benefit of Defendant including but not limited to such assets as may be held, received or transferred in any of its names, to wit: FAR EAST INTERNATIONAL PETROLEUM COMPANY LLC a/k/a FEIPCO, or as may be held, received or transferred for its benefit at, moving through, or within the possession, custody or control of banking institutions including but not limited to: ABN Amro, American Express Bank, Arab Bank, BNP Paribas, Bank of America, Brown Brothers Harriman, Citibank, Deutsche Bank Trust Co., Habib American Bank, HSBC, HSBC USA Bank NA, JPMorgan Chase Bank, Mashreqbank, Standard Chartered Bank, The Bank of New York, Wachovia

Bank, and/or any other garnishee(s) upon whom a copy of the Process of

Maritime Attachment and Garnishment issued in this action may be served; and

c.    That this Court retain jurisdiction over this matter for purposes of any subsequent

enforcement action as may be necessary; and,

d.    For such other, further and different relief as this Court may deem just and proper

in the premises.

Dated: New York, New York
       January 10, 2007

                              FREEHILL HOGAN & MAHAR, LLP
                              Attorneys for Plaintiff
                              PIGASOS NAVIGATION CO. LTD.

                              By: _____
                                    Gina M. Venezia (GV 1551)
                                    Pamela Schultz (PS 0335)
                                    80 Pine Street
                                    New York, NY 10005
                                    (212) 425-1900
                                    (212) 425-1901 fax

## ATTORNEY VERIFICATION

State of New York    )
                     ) ss.:
County of New York   )

GINA M. VENEZIA, being duly sworn, deposes and says as follows:

1.    I am a partner with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2.    The sources of my information and the grounds for my belief are communications, information and documentation provided by our client.

3.    The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

_____
Gina M. Venezia

Sworn to before me this
10th day of January 2007.

_____
Notary Public

MARTHA L. BROWN
Notary Public, State of New York
No. 01BR6067399
Qualified in Kings County
Certificate Filed in New York County
Commission Expires December 10, 2009

24-05-2004  18:56    From-Estoril Navigation    +302104110515    T-791  P.003  F-709

Code word for this Charter Party
"SHELLTIME 4"

# FIRST ORIGINAL

*Issued December 1984*

# Time Charter Party

~~LONDON~~Monrovia. 01.10.2003 ~~19~~

IT IS THIS DAY AGREED between *Messrs.Pigasos Navigation Co. Ltd.*,                          1

of *80 Broad Str. Monrovia Liberia*                          (hereinafter referred to as "Owners"), being owners of the    2

good *Liberian*                          vessel called *m/t Atlantic Sol*                          3

(hereinafter referred to as "the vessel") described as per Clause 1 hereof and *Messrs. Far East Int. Petroleum Co.*    4
*(Feipco)*

of *PO Box 2620, Amman 11821 Jordan* (hereinafter referred to as "Charterers"):                          5

*As per Questionnaire 88 herewith attached*

| | | |
|---|---|---|
| Description and | 1 | At the date of delivery of the vessel under this charter |
| Condition of | | (a)  she shall be classed: *ABS* |
| Vessel | | (b)  she shall be in every way fit to carry crude petroleum and/or *fuel oil/gasoil* ~~its products~~; |

(c)  she shall be tight, staunch, strong, in good order and condition, and in every way fit for the    9
service, with her machinery, boilers, hull and other equipment (including but not limited to hull stress calculator   10
and radar) in a good and efficient state;                          11
(d)  her tanks, valves and pipelines shall be oil-tight;                          12
(e)  she shall be in every way fitted for burning                          13

at sea - fueloil ~~with a maximum viscosity of~~                          14
~~Centistokes at 50 degrees Centigrade/any~~                          14
~~commercial grade of fueloil ("ACGFO")~~*IFO 180 cst* for main propulsion, ~~marine~~ *gasoil* ~~diesel~~    15
~~oil/ACGFO~~                          15

for auxiliaries                          16
in port - ~~marine~~ *gasoil as per dma* ~~diesel oil/ACGFO~~ for auxiliaries;                          17

~~(f)  she shall comply with the regulations in force so as to enable her to pass through the Suez and~~   18
~~Panama Canals by day and night without delay;~~                          19
(g)  she shall have on board all certificates, documents and equipment required from time to time by    20
any applicable law to enable her to perform the charter service without delay;                          21
~~(h)  she shall comply with the description in Form B appended hereto, provided however that if there~~   22
~~is any conflict between the provisions of Form B and any other provision, including this Clause 1, of this charter~~   23
~~such other provision shall govern.~~                          24

| | | |
|---|---|---|
| Shipboard | 2. | (a)  At the date of delivery of the vessel under this charter |
| Personnel | | (i)  she shall have a full and efficient complement of master, officers and crew for a vessel of her |
| and their Duties | | |

tonnage, who shall in any event be not less than the number required by the laws of the flag state and who shall be   27
trained to operate the vessel and her equipment competently and safely;                          28
(ii)  all shipboard personnel shall hold valid certificates of competence in accordance with the   29
requirements of the law of the flag state;                          30
(iii)  all shipboard personnel shall be trained in accordance with the relevant provisions of the   31
International Convention on Standards of Training, Certification and Watchkeeping for Seafarers, 1978;   32
(iv)  there shall be on board sufficient personnel with a good working knowledge of the English   33
language to enable cargo operations at loading and discharging places to be carried out efficiently and safely and   34
to enable communications between the vessel and those loading the vessel or accepting discharge therefrom to be   35
carried out quickly and efficiently.                          36
(b)  Owners guarantee that throughout the charter service the master shall with the vessel's officers   37
and crew, unless otherwise ordered by Charterers,                          38
(i)  prosecute all voyages with the utmost despatch;                          39
(ii)  render all customary assistance; and                          40
(iii)  load and discharge cargo as rapidly as possible when required by Charterers or their agent   41
to do so, by night or by day, but always in accordance with the laws of the place of loading or discharging (as the   42
case may be) and in each case in accordance with any applicable laws of the flag state.                          43

| | | |
|---|---|---|
| Duty to | 3. | (i)  Throughout the charter service Owners shall, whenever the passage of time, wear and tear or any |
| Maintain | | |

event (whether or not coming within Clause 27 hereof) requires steps to be taken to maintain or restore the   45
conditions stipulated in Clauses 1 and 2(a), exercise due diligence so to maintain or restore the vessel.   46
(ii)  If at any time whilst the vessel is on hire under this charter the vessel fails to comply with the   47
requirements of Clauses 1.2(a) or 10 then hire shall be reduced to the extent necessary to indemnify Charterers   48
for such failure. If and to the extent that such failure affects the time taken by the vessel to perform any services   49
under this charter, hire shall be reduced by an amount equal to the value, calculated at the rate of hire, of the time   50
so lost.                          51

Any reduction of hire under this sub-Clause (ii) shall be without prejudice to any other remedy   52
available to Charterers, but where such reduction of hire is in respect of time lost, such time shall be excluded   53

EXHIBIT

A

24-05-2004  18:56   From-Estoril Navigation          +302104110515      T-791  P.004   F-709

from any calculation under Clause 24.                                                               54

    (iii) If Owners are in breach of their obligation under Clause 3(i) Charterers may so notify Owners in   55
writing; and if, after the expiry of 30 days following the receipt by Owners of any such notice, Owners have failed   56
to demonstrate to Charterers' reasonable satisfaction the exercise of due diligence as required in Clause 3(i), the   57
vessel shall be off-hire, and no further hire payments shall be due, until Owners have so demonstrated that they   58
are exercising such due diligence.                                                                  59

    Furthermore, *at the end of 15 days* at any time while the vessel is off-hire under this Clause 3   60
Charterers have the

option to terminate this charter by giving notice in writing with effect from the date on which such notice of   61
termination is received by Owners or from any later date stated in such notice. This sub-Clause (iii) is without   62
prejudice to any rights of Charterers or obligations of Owners under this charter, or otherwise (including without   63
limitation Charterers rights under Clause 21 hereof).                                               64

**Period Trading**    4.  Owners agree to let and Charterers agree to hire the vessel for a period of *minimum six (6) months plus*   65
*three (3) months option plus three (3) months option in charterer's option. First option*
*declarable 30 days in advance, then 15 days, together with redelivery notice*

**Limits**    commencing from the time and date of delivery of the vessel, for the purpose of carrying all lawful merchandise   66
(subject always to Clause 28) including in particular *crude oil, fuel oil, gasoil, maximum 3 grades within*   67
*vessel's natural segregation.(see also additional clause No.49)*

~~in any part of the world~~, *storage only one safe anchorage off Aqaba, performing ship-to-ship*   68
*operations. All ship-to-ship operations will be done in accordance with latest ship-to-ship*
*guidance and good sea practice and OCIMF standards and always to be at master's discretion.*
*Charterers to provide all necessary equipment as per Ocimf standard for the ship-to-ship*
*operations at their risk and expenses. Master/crew to make best endeavours for the safety of the*
*sts equipment, but charterers always to remain responsible for the good working order of all*
*ship-to-ship equipment during the timecharter period.* as Charterers shall direct, subject to the limits of the
current British Institute Warranties

and any subsequent amendments thereof. ~~Notwithstanding the foregoing, but subject to Clause 25, Charterers~~   69
~~may order the vessel to ice-bound waters or to any part of the world outside such limits provided that Owners~~   70
~~consent thereto (such consent not to be unreasonably withheld) and Charterers pay for any insurance~~   71
~~premium required by the vessel's underwriters as a consequence of such order.~~   72

    Charterers shall use due diligence to ensure that the vessel is only employed between and at safe places   73
(which expression when used in this charter shall include ports, berths, wharves, docks, anchorages, submarine   74
lines, alongside vessels or lighters, and other locations including locations at sea) where she can safely lie always   75
afloat. Notwithstanding anything contained in this or any other clause of this charter, Charterers do not warrant   76
the safety of any place to which they order the vessel and shall be under no liability in respect thereof except for   77
loss or damage caused by their failure to exercise due diligence as aforesaid. Subject as above, the vessel shall be   78
loaded and discharged at any places as Charterers may direct, provided that Charterers shall exercise due   79
diligence to ensure that any ship-to-ship transfer operations shall conform to standards not less than those set out   80
in the latest published edition of the ICS/OCIMF Ship-to-Ship Transfer Guide.   81

    The vessel shall be delivered by Owners at a port in *1 safe anchorage Fujairah*   82

~~at Owners' option~~ and redelivered to Owners at ~~a port in~~ *1 safe port Aqaba*   83

at Charterers' option.   84

**Laydays/**    5.  The vessel shall not be delivered to Charterers before *28/10/03*   and Charterers shall   85
**Cancelling**  have the option of cancelling this charter if the vessel is not ready and at their disposal on or before *31/10/03*   86

**Owners to**    6.  Owners undertake to provide and to pay for all provisions, wages, and shipping and discharging fees   87
**Provide**  and all other expenses of the master, officers and crew; also, except as provided in Clauses 4 and 34 hereof, for all   88
insurance on the vessel, for all deck, cabin and engine-room stores, and for water, *water on board the vessel shall*   89
*be available to charterers free of charge. Water, if any, bought and used to comply with*
*charterers instructions shall be for charterers account. Owners/Master to make best endeavour to*
*store as much fresh water as possible if requested by charterers;* for all drydocking, overhaul,
maintenance and repairs to the vessel; and for all fumigation expenses and de-rat certificates. Owners'   90
obligations under this Clause 6 extend to all liabilities for customs or import duties arising at any time during the   91
performance of this charter in relation to the personal effects of the master, officers and crew, and in relation to   92
the stores, provisions and other matters aforesaid which Owners are to provide and pay for and Owners shall   93
refund to Charterers any sums Charterers or their agents may have paid or been compelled to pay in respect of   94
any such liability. Any amounts allowable in general average for wages and provisions and stores shall be credited   95
to Charterers insofar as such amounts are in respect of a period when the vessel is on-hire.   96

**Charterers to**    7.  Charterers shall provide and pay for all fuel (except fuel used for domestic services), towage and   97
**Provide**  pilotage and shall pay agency fees, port charges, commissions, expenses of loading and unloading cargoes, canal   98
dues and all charges other than those payable by Owners in accordance with Clause 6 hereof, provided that all   99
charges for the said items shall be for Owners' account when such items are consumed, employed or incurred for   100
Owners' purposes or while the vessel is off-hire (unless such items reasonably relate to any service given or   101
distance made good and taken into account under Clause 21 or 22); and provided further that any fuel used in   102
connection with a general average sacrifice or expenditure shall be paid for by Owners.   103

**Rate of**    8.  Subject as herein provided, Charterers shall pay for the use and hire of the vessel at the rate of   104
**Hire**  *USD 10.000 including Luboeils and 5 pct total commissions* per day, and pro rata for any part of a day,   105
overtime included, from the time and date of her delivery (local
time) until the time and date of her redelivery (local time) to Owners. *On voyage (ie from delivery to storage*   106
*anchorage and leaving storage anchorage to final redelivery port or any other voyage) payable at*

24-05-2004  18:56    From-Estoril Navigation    +302104110515    T-791  P.005  F-709

*USD 11.000 pdpr gross*

**Payment of Hire**

9.  Subject to Clause 3(iii), payment of hire shall be made in immediately available funds to: *owners designated bank*    107

Account    108

in  ~~per calendar month in advance~~ *thirty (30) days in advance. First hire period to be paid 3 days prior delivery of the vessel* less:    109

(i)  any hire paid which Charterers reasonably estimate to relate to off-hire periods, and    110
(ii)  any amounts disbursed on Owners' behalf, any advances and commission thereon, and charges which are for Owners' account pursuant to any provision hereof, and    111 112
(iii)  any amounts due or reasonably estimated to become due to Charterers under Clause 3(ii) or 24 hereof,    113 114

any such adjustments to be made at the due date for the next monthly payment after the facts have been ascertained. Charterers shall not be responsible for any delay or error by Owners' bank in crediting Owners' account provided that Charterers have made proper and timely payment.    115 116 117.

In default of such proper and timely payment,    118

(a)  Owners shall notify Charterers of such default and Charterers shall within seven days of receipt of such notice pay to Owners the amount due including interest, failing which Owners may withdraw the vessel from the service of Charterers without prejudice to any other rights Owners may have under this charter or otherwise; and    119 120 121 122

(b)  ~~Interest on any amount due but not paid on the due date shall accrue from the day after that date up to and including the day when payment is made, at a rate per annum which shall be 1% above the U.S. Prime Interest Rate as published by the Chase Manhattan Bank in New York at 12:00 New York time on the due date, or, if no such interest rate is published on that day, the interest rate published on the next preceding day on which such a rate was so published, computed on the basis of a 360 day year of twelve 30 day months, compounded semi-annually.~~    123 124 125 126 127 128

**Space Available to Charterers**

10.  The whole reach, burthen and decks of the vessel and any passenger accommodation (including Owners' suite), *if available*, shall be at Charterers' disposal, reserving only proper and sufficient space for the vessel's master,    129 130

officers, crew, tackle, apparel, furniture, provisions and stores, provided that the weight of stores on board shall not, unless specially agreed, exceed *300* tonnes at any time during the charter period.    131 132

**Overtime**

11.  Overtime pay of the master, officers and crew in accordance with ship's articles shall be for *Owners' ~~Charterers~~* account when incurred, as a result of complying with the request of Charterers or their agents, for loading, discharging, heating of cargo, bunkering ~~or tank cleaning~~.    133 134 135

**Instructions and Logs**

12.  Charterers shall from time to time give the master all requisite instructions and sailing directions, and he shall keep a full and correct log of the voyage or voyages, which Charterers or their agents may inspect as required. The master shall when required furnish Charterers or their agents with a true copy of such log and with properly completed loading and discharging port sheets and voyage reports for each voyage and other returns as Charterers may require. Charterers shall be entitled to take copies at Owners' expense of any such documents which are not provided by the master.    136 137 138 139 140 141

**Bills of Lading**

13.  (a)  The master (although appointed by Owners) shall be under the orders and direction of Charterers as regards employment of the vessel, agency and other arrangements, and shall sign bills of lading as Charterers or their agents may direct (subject always to Clauses 35(a) and 40) without prejudice to this charter.    142 143 144

Charterers hereby indemnify Owners against all consequences or liabilities that may arise    145

(i)  from signing bills of lading in accordance with the directions of Charterers, or their agents, to the extent that the terms of such bills of lading fail to conform to the requirements of this charter, or (except as provided in Clause 13(b)) from the master otherwise complying with Charterers or their agents' orders;    146 147 148 149

(ii)  from any irregularities in papers supplied by Charterers or their agents.    150

(b)  Notwithstanding the foregoing, Owners shall not be obliged to comply with any orders from Charterers to discharge all or part of the cargo    151

(i)  at any place other than that shown on the bill of lading and/or    152

(ii)  without presentation of an original bill of lading    153

unless they have received from Charterers both written confirmation of such orders and an indemnity in a form acceptable to Owners. *(LOI as owner's P&I Club wording)*    154 155

**Conduct of Vessel's Personnel**

14.  If Charterers complain of the conduct of the master or any of the officers or crew, Owners shall immediately investigate the complaint. If the complaint proves to be well founded, Owners shall, without delay, make a change in the appointments and Owners shall in any event communicate the result of their investigations to Charterers as soon as possible.    156 157 158 159

**Bunkers at Delivery and Redelivery**

15.  ~~Charterers shall accept and pay for all bunkers on board at the time of delivery, and Owners shall on redelivery (whether it occurs at the end of the charter period or on the earlier termination of this charter) accept and pay for all bunkers remaining on board, at the then current market prices at the port of delivery or redelivery; in the case may be, or, if such prices are not available payment shall be at the then current market price, or the nearest port at which such prices are available; provided that if delivery or redelivery does not take place in a port payment shall be at the price paid at the vessel's last port of bunkering before delivery or redelivery, as the case may be. Owners shall give Charterers the use and benefit of any fuel contracts they may have in force from time to time, if so required by Charterers provided suppliers agree.~~ *Amount of the bunker on delivery to be paid together with first hire at the price of the latest purchase of the bunker by the owners (same to be confirmed by fax copy of the original vouchers) Bunker on redelivery to be deducted from the last hire payment and to be on basis redelivery protocol/inspections. Price of the bunker on re-delivery to be same as on delivery. Bunkers on redelivery to be approximate same as on delivery*    160 161 162 163 164 165 166 167

24-05-2004  18:56   From-Estoril Navigation          +302104110515      T-791  P.006/022  F-708

<table>
<tr><td>Stevedores,<br>Pilots, Tugs</td><td>16. Stevedores when required shall be employed and paid by Charterers, but this shall not relieve Owners<br>from responsibility at all times for proper stowage, which must be controlled by the master who shall keep a strict<br>account of all cargo loaded and discharged. Owners hereby indemnify Charterers, their servants and agents<br>against all losses, claims, responsibilities and liabilities arising in any way whatsoever from the employment of<br>pilots, tugboats or stevedores, who although employed by Charterers shall be deemed to be the servants of and in<br>the service of Owners and under their instructions (even if such pilots, tugboat personnel or stevedores are in fact<br>the servants of Charterers their agents or any affiliated company); provided, however, that<br>  (i) the foregoing indemnity shall not exceed the amount to which Owners would have been<br>entitled to limit their liability if they had themselves employed such pilots, tugboats or stevedores, and<br>  (ii) Charterers shall be liable for any damage to the vessel caused by or arising out of the use of<br>stevedores, fair wear and tear excepted, to the extent that Owners are unable by the exercise of due diligence to<br>obtain redress therefor from stevedores.</td><td>168<br>169<br>170<br>171<br>172<br>173<br>174<br>175<br>176<br>177<br>178<br>179</td></tr>
</table>

Supernumeraries    17. Charterers may send *maximum 2* representatives *on board to supervise loading/discharging,*   180
*quality, quantity etc.* in the vessel's available accommodation *and office* upon any voyage made    181
under this charter, Owners finding provisions and all requisites as supplied to officers, except liquors, Charterers   182
paying at the rate of *USD 10* per day*, for each representative while on board the vessel. It is*
*clear that above amount is due to owners only if charterer's representatives spend full day on*
*board as if vessel in navigation and that for short visits no charge is due to.*

Sub-letting    18. Charterers may sub-let the vessel, but shall always remain responsible to Owners for due fulfilment of   183
this charter.   184

Final Voyage    19. If when a payment of hire is due hereunder Charterers reasonably expect to redeliver the vessel before   185
the next payment of hire would fall due, the hire to be paid shall be assessed on Charterers' reasonable estimate of   186
the time necessary to complete Charterers' programme up to redelivery, and from which estimate Charterers   187
may deduct amounts due or reasonably expected to become due for   188
  (i) disbursements on Owners' behalf or charges for Owners' account pursuant to any provision   189
hereof, and   190
  (ii) bunkers on board at redelivery pursuant to Clause 15.   191
  Promptly after redelivery any overpayment shall be refunded by Owners or any underpayment made   192
good by Charterers.   193
  If at the time this charter would otherwise terminate in accordance with Clause 4 the vessel is on a   194
ballast voyage to a port of redelivery or is upon a laden voyage, Charterers shall continue to have the use of the   195
vessel at the same rate and conditions as stand herein for as long as necessary to complete such ballast voyage, or   196
to complete such laden voyage and return to a port of redelivery as provided by this charter, as the case may be.   197

Loss of    20. Should the vessel be lost, this charter shall terminate and hire shall cease at noon on the day of her loss;   198
Vessel   should the vessel be a constructive total loss, this charter shall terminate and hire shall cease at noon on the day on   199
which the vessel's underwriters agree that the vessel is a constructive total loss; should the vessel be missing, this   200
charter shall terminate and hire shall cease at noon on the day on which she was last heard of. Any hire paid in   201
advance and not earned shall be returned to Charterers and Owners shall reimburse Charterers for the value of   202
the estimated quantity of bunkers on board at the time of termination, at the price paid by Charterers at the last   203
bunkering port.   204

Off-hire    21. (a) On each and every occasion that there is loss of time (whether by way of interruption in the   205
vessel's service or, from reduction in the vessel's performance, or in any other manner)   206
  (i) due to deficiency of personnel or stores; repairs; gas-freeing for repairs; time in and waiting   207
to enter dry dock for repairs; breakdown (whether partial or total) of machinery, boilers or other *major* parts of the   208
vessel or her equipment (including without limitation tank coatings); overhaul, maintenance or survey; collision,   209
stranding, accident or damage to the vessel; or any other similar cause preventing the efficient working of the   210
vessel; and such loss continues for more than three consecutive hours (if resulting from interruption in the vessel's   211
service) or cumulates to more than three hours (if resulting from partial loss of service); or   212
  (ii) due to industrial action, refusal to sail, breach of orders or neglect of duty on the part of the   213
master, officers or crew; or   214
  (iii) for the purpose of obtaining medical advice or treatment for or landing any sick or injured   215
person (other than a Charterers' representative carried under Clause 17 hereof) or for the purpose of landing the   216
body of any person (other than a Charterers' representative), and such loss continues for more than three   217
consecutive hours: or   218
  (iv) due to any delay in quarantine arising from the master, officers or crew having had   219
communication with the shore at any infected area without the written consent or instructions of Charterers or   220
their agents, or to any detention by customs or other authorities caused by smuggling or other infraction of local   221
law on the part of the master, officers, or crew; or   222
  (v) due to detention of the vessel by authorities at home or abroad attributable to legal action   223
against or breach of regulations by the vessel, the vessel's owners, or Owners (unless brought about by the act or   224
neglect of Charterers); then   225
  without prejudice to Charterers' rights under Clause 3 or to any other rights of Charterers   226
hereunder or otherwise the vessel shall be off-hire from the commencement of such loss of time until she is again   227
ready and in an efficient state to resume her service from a position not less favourable to Charterers than that at   228
which such loss of time commenced; provided, however, that any service given or distance made good by the   229
vessel whilst offhire shall be taken into account in assessing the amount to be deducted from hire.   230
  (b) If the vessel fails to proceed at any guaranteed speed pursuant to Clause 24, and such failure   231
arises wholly or partly from any of the causes set out in Clause 21(a) above, then the period for which the vessel   232
shall be off-hire under this Clause 21 shall be the difference between   233
  (i) the time the vessel would have required to perform the relevant service at such guaranteed   234
speed, and   235
  (ii) the time actually taken to perform such service (including any loss of time arising from   236
interruption in the performance of such service).   237
  For the avoidance of doubt, all time included under (ii) above shall be excluded from any   238

24-05-2004  19:57   From-Estoril Navigation          +302104110515        T-791  P.007/022  F-709
FIRST ORIGINAL

computation under Clause 24.

(c) Further and without prejudice to the foregoing, in the event of the vessel deviating (which 240
expression includes without limitation putting back, or putting into any port other than that to which she is bound 241
under the instructions of Charterers) for any cause or purpose mentioned in Clause 21(a), the vessel shall be 242
off-hire from the commencement of such deviation until the time when she is again ready and in an efficient state 243
to resume her service from a position not less favourable to Charterers than that at which the deviation 244
commenced, provided, however, that any service given or distance made good by the vessel whilst so off-hire 245
shall be taken into account in assessing the amount to be deducted from hire. If the vessel, for any cause or 246
purpose mentioned in Clause 21 (a), puts into any port other than that to which she is bound on the 247
instructions of Charterers, the port charges, pilotage and other expenses at such port shall be borne by Owners. 248
Should the vessel be driven into any port or anchorage by stress of weather hire shall continue to be due and 249
payable during any time lost thereby. 250

(d) If the vessel's flag state becomes engaged in hostilities, and Charterers in consequence of such 251
hostilities find it commercially impracticable to employ the vessel and have given Owners written notice thereof 252
then from the date of receipt by Owners of such notice until the termination of such commercial impracticability 253
the vessel shall be off-hire and Owners shall have the right to employ the vessel on their own account. 254

(e) Time during which the vessel is off-hire under this charter shall count as part of the charter 255
period. 256

Periodical          22.  (a)  ~~Owners have the right and obligation to drydock the vessel at regular intervals of~~ 257
Drydocking                    ~~On each occasion Owners shall propose to Charterers a date on which they wish to~~ 258
                    ~~drydock the vessel, not less than                     before such date, and Charterers shall offer a port for~~ 259
                    ~~such periodical drydocking and shall take all reasonable steps to make the vessel available as near to such date as~~ 260
                    ~~practicable.~~ 261
                    ~~Owners shall put the vessel in drydock at their expense as soon as practicable after Charterers~~ 262
                    ~~place the vessel at Owners' disposal clear of cargo other than tank washings and residues. Owners shall be~~ 263
                    ~~responsible for and pay for the disposal into reception facilities of such tank washings and residues and shall have~~ 264
                    ~~the right to retain any monies received therefor, without prejudice to any claim for loss of cargo under any bill of~~ 265
                    ~~lading or this charter.~~ 266
                    ~~(b)  If a periodical drydocking is carried out in the port offered by Charterers (which must have~~ 267
                    ~~suitable accommodation for the purpose and reception facilities for tank washings and residues), the vessel shall~~ 268
                    ~~be off-hire from the time she arrives at such port until drydocking is completed and she is in every way ready to~~ 269
                    ~~resume Charterers' service and is at the position at which she went off-hire or a position no less favourable to~~ 270
                    ~~Charterers, whichever she first attains. However;~~ 271
                    ~~(i)  provided that Owners exercise due diligence in gas freeing, any time lost in gas freeing to~~ 272
                    ~~the standard required for entry into drydock for cleaning and painting the hull shall not count as off-hire, whether~~ 273
                    ~~lost on passage to the drydocking port or after arrival there (notwithstanding Clause 21), and~~ 274
                    ~~(ii)  any additional time lost in further gas freeing to meet the standard required for hot work or~~ 275
                    ~~entry to cargo tanks shall count as off-hire, whether lost on passage to the drydocking port or after arrival there.~~ 276
                    ~~Any time lost, which, but for sub-Clause (i) above, would be off-hire, shall not be included in any~~ 277
                    ~~calculation under Clause 24.~~ 278
                    ~~The expenses of gas-freeing, including without limitation the cost of bunkers, shall be for~~ 279
                    ~~Owners account.~~ 280
                    ~~(c)  If Owners require the vessel, instead of proceeding to the offered port, to carry out periodical~~ 281
                    ~~drydocking at a special port selected by them, the vessel shall be off-hire from the time when she is released to~~ 282
                    ~~proceed to the special port until she next presents for loading in accordance with Charterers' instructions;~~ 283
                    ~~provided, however, that Charterers shall credit Owners with the time which would have been taken on passage at~~ 284
                    ~~the service speed had the vessel not proceeded to drydock. All fuel consumed shall be paid for by Owners but~~ 285
                    ~~Charterers shall credit Owners with the value of the fuel which would have been used on such notional passage~~ 286
                    ~~calculated at the guaranteed daily consumption for the service speed, and shall further credit Owners with any~~ 287
                    ~~benefit they may gain in purchasing bunkers at the special port.~~ 288
                    ~~(d)  Charterers shall, insofar as cleaning for periodical drydocking may have reduced the amount of~~ 289
                    ~~tank cleaning necessary to meet Charterers' requirements, credit Owners with the value of any bunkers which~~ 290
                    ~~Charterers calculate to have been saved thereby, whether the vessel drydocks at an offered or a special port.~~ *Owners* 291
*guarantee that all vessel's national and international certificates will be valid and in order
during the time charter period and no periodical drydock and survey is due during the time
charter period unless in case of emergency.*

Ship Inspection     23.  Charterers shall have the right at any time during the charter period to make such inspection of the 292
vessel as they may consider necessary. This right may be exercised as often and at such intervals as Charterers in 293
their absolute discretion may determine and whether the vessel is in port or on passage. Owners affording all 294
necessary co-operation and accommodation on board provided, however, 295

(i)  that neither the exercise nor the non-exercise, nor anything done or not done in the exercise 296
or non-exercise, by Charterers of such right shall in any way reduce the master's or Owners' authority over, or 297
responsibility to Charterers or third parties for, the vessel and every aspect of her operation, nor increase 298
Charterers' responsibilities to Owners or third parties for the same; and 299

(ii)  that Charterers shall not be liable for any act, neglect or default by themselves, their 300
servants or agents in the exercise or non-exercise of the aforesaid right. 301

Detailed            24.  (a)  Owners guarantee that the speed and consumption of the vessel shall be ~~as follows:~~ 302
Description
and Performance     ~~Average speed              Maximum average bunker consumption~~ 303
                    ~~in knots                    main propulsion    -    auxiliaries~~ 304
                    ~~fuel oil/diesel oil    fuel oil/diesel oil~~ 305
                    ~~Laden                       tonnes              tonnes~~ 306

                    ~~Ballast~~ . 307

FIRST ORIGINAL

*Speed/Consumption: Speed ladden/Ballas:*
*A) Speed 10  knots 24.5 mt/22  mt*
*B) Speed 10.5 knots 26.5 mt/24  mt*
*C) Speed 11  knots 29.5 mt/26.5 mt*
*D) Speed 11.5 knots 31.5 mt/29.5 mt*
*E) Speed 12  knots 33.5 mt/30.5 mt*
*F) Idle 2,0 mt Gasoil, if in operation 3 mt*
*To all above given consumptions, please add 2,2 mt gasoil for D/G per day*
*Above upto maximum 5 Beaufort scale*
*Other individuals operations (vessel burning H.F.O. 180 Cst):*
*A)stby 2 mt gasoil 2 mt Ifo*
*B)discharging cargo with shore facilities capable to receive 6000 m3 hour consumption per hour*
*2.2 mt*
*C)C.O.W. 0.7 ton per hour additional*
*D)Tank cleaning 6 mt per tank, if required*
*E) Ballasting 5 mt IFO*
*F)Deballasting 7 mt IFO*

The foregoing bunker consumptions are for all purposes except cargo heating and tank cleaning 308
and shall be pro-rated between the speeds shown. 309

The service speed of the vessel is          knots laden and          knots in ballast and in the absence 310
of Charterers' orders to the contrary the vessel shall proceed at the service speed. However if more than one 311
laden and one ballast speed are shown in the table above Charterers shall have the right to order the vessel to 312
steam at any speed within the range set out in the table (the "ordered speed"). 313

If the vessel is ordered to proceed at any speed other than the highest speed shown in the table, 314
and the average speed actually attained by the vessel during the currency of such order exceeds such ordered 315
speed plus 0.5 knots (the "maximum recognised speed"), then for the purpose of calculating any increase or 316
decrease of hire under this Clause 24 the maximum recognised speed shall be used in place of the average speed 317
actually attained. 318

For the purposes of this charter the "guaranteed speed" at any time shall be the then-current 319
ordered speed or the service speed, as the case may be 320

The average speeds and bunker consumptions shall for the purposes of this Clause 24 be 321
calculated by reference to the observed distance from pilot station to pilot station on all sea passages during each 322
period stipulated in Clause 24 (c), but excluding any time during which the vessel is (or but for Clause 22(b) (i) 323
would be) off-hire and also excluding "Adverse Weather Periods", being (i) any periods during which reduction 324
of speed is necessary for safety in congested waters or in poor visibility (ii) any days, noon to noon, when winds 325
exceed force 8 on the Beaufort Scale for more than 12 hours. 326

(b)  If during any year from the date on which the vessel enters service (anniversary to anniversary) 327
the vessel falls below or exceeds the performance guaranteed in Clause 24(a) then if such shortfall or excess 328
results 329

(i)  from a reduction or an increase in the average speed of the vessel, compared to the speed 330
guaranteed in Clause 24(a), then an amount equal to the value at the hire rate of the time so lost or gained, as the 331
case may be, shall be deducted from or added to the hire paid; 332

(ii)  from an increase or a decrease in the total bunkers consumed, compared to the total bunkers 333
which would have been consumed had the vessel performed as guaranteed in Clause 24(a), an amount equivalent 334
to the value of the additional bunkers consumed or the bunkers saved, as the case may be, based on the average 335
price paid by Charterers for the vessel's bunkers in such period, shall be deducted from or added to the hire paid. 336

The addition to or deduction from hire so calculated for laden and ballast mileage respectively 337
shall be adjusted to take into account the mileage steamed in each such condition during Adverse Weather 338
Periods, by dividing such addition or deduction by the number of miles over which the performance has been 339
calculated and multiplying by the same number of miles plus the miles steamed during the Adverse Weather 340
Periods, in order to establish the total addition to or deduction from hire to be made for such period. 341

Reduction of hire under the foregoing sub-Clause (b) shall be without prejudice to any other 342
remedy available to Charterers. 343

(c)  Calculations under this Clause 24 shall be made for the yearly periods terminating on each 344
successive anniversary of the date on which the vessel enters service, and for the period between the last such 345
anniversary and the date of termination of this charter if less than a year. Claims in respect of reduction of hire 346
arising under this Clause during the final year or part year of the charter period shall in the first instance be settled 347
in accordance with Charterers' estimate made two months before the end of the charter period. Any necessary 348
adjustment after this charter terminates shall be made by payment by Owners to Charterers or by Charterers to 349
Owners as the case may require. 350

~~Payments in respect of increase of hire arising under this Clause shall be made promptly after~~ 351
~~receipt by Charterers of all the information necessary to calculate such increase.~~ *Owners not to have the right to* 352
*increase  hire  for overperformance but any  overperformance to  be  credited against*
*underperformance, if any.*

Salvage          25.  Subject to the provisions of Clause 21 hereof, all loss of time and all expenses ( excluding any damage to 353
or loss of the vessel or tortious liabilities to third parties) incurred in saving or attempting to save life or in 354
successful or unsuccessful attempts at salvage shall be borne equally by Owners and Charterers provided that 355
Charterers shall not be liable to contribute towards any salvage payable by Owners arising in any way out of 356
services rendered under this Clause 25. 357

All salvage and all proceeds from derelicts shall be divided equally between Owners and Charterers 358
after deducting the master's, officers' and crew's share. 359

Lien

26. Owners shall have a lien upon all cargoes and all freights, sub-freights and demurrage for any amounts 360
due under this charter; and Charterers shall have a lien on the vessel for all monies paid in advance and not 361
earned, and for all claims for damages arising from any breach by Owners of this charter. 362

Exceptions

27. (a) The vessel, her master and Owners shall not, unless otherwise in this charter expressly provided, 363
be liable for any loss or damage or delay or failure arising or resulting from any act, neglect or default of the 364
master, pilots, mariners or other servants of Owners in the navigation or management of the vessel; fire, unless 365
caused by the actual fault or privity of Owners; collision or stranding; dangers and accidents of the sea; explosion, 366
bursting of boilers, breakage of shafts or any latent defect in hull, equipment or machinery; provided, however, 367
that Clauses 1, 2, 3 and 24 hereof shall be unaffected by the foregoing. Further, neither the vessel, her master or 368
Owners, nor Charterers shall, unless otherwise in this charter expressly provided, be liable for any loss or damage 369
or delay or failure in performance hereunder arising or resulting from act of God, act of war, seizure under legal 370
process, quarantine restrictions, strikes, lock-outs, riots, restraints of labour, civil commotions or arrest or 371
restraint of princes, rulers or people. 372
     (b) The vessel shall have liberty to sail with or without pilots, to tow or go to the assistance of vessels 373
in distress and to deviate for the purpose of saving life or property. 374
     (c) Clause 27(a) shall not apply to or affect any liability of Owners or the vessel or any other relevant 375
person in respect of 376
          (i) loss or damage caused to any berth, jetty, dock, dolphin, buoy, mooring line, pipe or crane 377
or other works or equipment whatsoever at or near any place to which the vessel may proceed under this charter, 378
whether or not such works or equipment belong to Charterers, or 379
          (ii) any claim (whether brought by Charterers or any other person) arising out of any loss of or 380
damage to or in connection with cargo. All such claims shall be subject to the Hague-Visby Rules or the Hague 381
Rules, as the case may be, which ought pursuant to Clause 38 hereof to have been incorporated in the relevant bill 382
of lading (whether or not such Rules were so incorporated) or, if no such bill of lading is issued, to the 383
Hague-Visby Rules. 384
     (d) In particular and without limitation, the foregoing subsections (a) and (b) of this Clause shall not 385
apply to or in any way affect any provision in this charter relating to off-hire or to reduction of hire. 386

Injurious
Cargoes

28. No acids, explosives or cargoes injurious to the vessel shall be shipped and without prejudice to the 387
foregoing any damage to the vessel caused by the shipment of any such cargo, and the time taken to repair such 388
damage, shall be for Charterers' account. No voyage shall be undertaken, nor any goods or cargoes loaded, that 389
would expose the vessel to capture or seizure by rulers or governments. 390

Grade of
Bunkers

29. Charterers shall supply Ifo 180 cst ~~marine diesel oil/fuel oil with a maximum viscosity of~~   ~~Cenil-stokes at 50~~ 391
~~degrees Centigrade/ACGFO~~ for main propulsion and gasoil as per dma ~~diesel oil/ACGFO~~ for the auxiliaries. If Owners 392
require 393
the vessel to be supplied with more expensive bunkers they shall be liable for the extra cost thereof.
     Charterers warrant that all bunkers provided by them in accordance herewith shall be of a quality 394
complying with the International Marine Bunker Supply Terms and Conditions of Shell International Trading 395
Company and with its specification for marine fuels as amended from time to time. 396

Disbursements

30. Should the master require advances for ordinary disbursements at any port, Charterers or their agents 397
shall make such advances to him, in consideration of which Owners shall pay a commission of two and a half per 398
cent, and all such advances and commission shall be deducted from hire. 399

Laying-up

31. Charterers shall have the option, after consultation with Owners, of requiring Owners to lay up the 400
vessel at a safe place nominated by Charterers, in which case the hire provided for under this charter shall be 401
adjusted to reflect any net increases in expenditure reasonably incurred or any net saving which should 402
reasonably be made by Owners as a result of such lay-up, Charterers may exercise the said option any number of 403
times during the charter period. 404

Requisition

32. Should the vessel be requisitioned by any government, de facto or de jure, during the period of this 405
charter, the vessel shall be off-hire during the period of such requisition, and any hire paid by such government in 406
respect of such requisition period shall be for Owners' account. Any such requisition period shall count as part of 407
the charter period. 408

Outbreak of War

33. If war or hostilities break out between any two or more of the following countries: U.S.A., Russia ~~U.S.S.R.~~ 409
~~P.R.C., U.K., Netherlands~~ Greece both Owners and Charterers shall have the right to cancel this charter. 410

Additional War
Expenses

34. If the vessel is ordered to trade in areas where there is war (de facto or de jure) or threat of war, 411
Charterers shall reimburse Owners for any additional insurance premia, crew bonuses and other expenses which 412
are reasonably incurred by Owners as a consequence of such orders, provided that Charterers are given notice of 413
such expenses as soon as practicable and in any event before such expenses are incurred, and provided further 414
that Owners obtain from their insurers a waiver of any subrogated rights against Charterers in respect of any 415
claims by Owners under their war risk insurance arising out of compliance with such orders. 416

War Risks

35. (a) The master shall not be required or bound to sign bills of lading for any place which in his or 417
Owners' reasonable opinion is dangerous or impossible for the vessel to enter or reach owing to any blockade, 418
war, hostilities, warlike operations, civil war, civil commotions or revolutions. 419
     (b) If it is the reasonable opinion of the master or Owners it becomes, for any of the reasons set out in 420
Clause 35(a) or by the operation of international law, dangerous, impossible or prohibited for the vessel to reach 421
or enter, or to load or discharge cargo at, any place to which the vessel has been ordered pursuant to this charter 422
(a "place of peril"), then Charterers or their agents shall be immediately notified by telex or radio messages, and 423
Charterers shall thereupon have the right to order the cargo, or such part of it as may be affected, to be loaded or 424
discharged, as the case may be, at any other place within the trading limits of this charter (provided such other 425
place is not itself a place of peril). If any place of discharge is or becomes a place of peril, and no orders have been 426
received from Charterers or their agents within 43 hours after dispatch of such messages, then Owners shall be at 427
liberty to discharge the cargo or such part of it as may be affected at any place which they or the master may in 428
their or his discretion select within the trading limits of this charter and such discharge shall be deemed to be due 429

fulfilment of Owners' obligations under this charter so far as cargo so discharged is concerned. 430

(c)  The vessel shall have liberty to comply with any directions or recommendations as to departure, 431 arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any other wise whatsoever 432 given by the government of the state under whose flag the vessel sails or any other government or local authority 433 or by any person or body acting or purporting to act as or with the authority of any such government or local 434 authority including any de facto government or local authority or by any person or body acting or purporting to 435 act as or with the authority of any such government or local authority or by any committee or person having under 436 the terms of the war risks insurance on the vessel the right to give any such directions or recommendations. If by 437 reason of or in compliance with any such directions or recommendations anything is done or is not done, such 438 shall not be deemed a deviation. 439

If by reason of or in compliance with any such direction or recommendation the vessel does not 440 proceed to any place of discharge to which she has been ordered pursuant to this charter, the vessel may proceed 441 to any place which the master or Owners in his or their discretion select and there discharge the cargo or such part 442 of it as may be affected. Such discharge shall be deemed to be due fulfilment of Owners obligations under this 443 charter so far as cargo so discharged is concerned. 444

Charterers shall procure that all bills of lading issued under this charter shall contain the Chamber of 445 Shipping War Risks Clause 1952. 446

Both to Blame
Collision Clause

36.  If the liability for any collision in which the vessel is involved while performing this charter falls to be 447 determined in accordance with the laws of the United States of America, the following provision shall apply: 448

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any 449 act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the 450 management of the ship, the owners of the cargo carried hereunder will indemnify the carrier against all loss, or 451 liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or 452 damage to, or any claim whatsoever of the owners of the said cargo, paid or payable by the other or non-carrying 453 ship or her owners to the owners of the said cargo and set off, recouped or recovered by the other or non-carrying 454 ship or her owners as part of their claim against the carrying ship or carrier." 455

"The foregoing provisions shall also apply where the owners, operators or those in charge of any ship 456 or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or 457 contract." 458

Charterers shall procure that all bills of lading issued under this charter shall contain a provision in the 459 foregoing terms to be applicable where the liability for any collision in which the vessel is involved falls to be 460 determined in accordance with the laws of the United States of America. 461

New Jason
Clause

37.  General average contributions shall be payable according to the York/Antwerp Rules, 1974 as amended 462 1994 and shall 463
be adjusted in London in accordance with English law and practice but should adjustment be made in accordance 464 with the law and practice of the United States of America, the following provision shall apply: 465

"In the event of accident, danger, damage or disaster before or after the commencement of the 466 voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the 467 consequence of which, the carrier is not responsible by statute, contract or otherwise, the cargo, shippers, 468 consignees or owners of the cargo shall contribute with the carrier in general average to the payment of any 469 sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and 470 special charges incurred in respect of the cargo." 471

"If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said 472 salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover 473 the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by 474 the cargo, shippers, consignees or owners of the cargo to the carrier before delivery." 475

Charterers shall procure that all bills of lading issued under this charter shall contain a provision in the 476 foregoing terms, to be applicable where adjustment of general average is made in accordance with the laws and 477 practice of the United States of America.

Clause
Paramount

38.  Charterers shall procure that all bills of lading issued pursuant to this charter shall contain the 478 following clause: 479

"(1) Subject to sub-clause (2) hereof, this bill of lading shall be governed by, and have effect subject 480 to, the rules contained in the International Convention for the Unification of Certain Rules relating to Bills of 481 Lading signed at Brussels on 25th August 1924 (hereafter the "Hague Rules") as amended by the Protocol signed 482 at Brussels on 23rd February 1968 (hereafter the "Hague-Visby Rules"). Nothing contained herein shall be 483 deemed to be either a surrender by the carrier of any of his rights or immunities or any increase of any of his 484 responsibilities or liabilities under the "Hague-Visby Rules." 485

"(2) If there is governing legislation which applies the Hague Rules compulsorily to this bill of lading, 486 to the exclusion of the Hague-Visby Rules, then this bill of lading shall have effect subject to the Hague Rules. 487 Nothing herein contained shall be deemed to be either a surrender by the carrier of any of his rights or immunities 488 or an increase of any of his responsibilities or liabilities under the Hague Rules." 489

"(3) If any term of this bill of lading is repugnant to the Hague-Visby Rules, or Hague Rules if 490 applicable, such term shall be void to that extent but no further." 491

"(4) Nothing in this bill of lading shall be construed as in any way restricting, excluding or waiving the 492 right of any relevant party or person to limit his liability under any available legislation and/or law." 493

494

TOVALOP

~~39.  Owners warrant that the vessel is:~~ 495
~~(i)   member in TOVALOP and~~ 496
~~(ii)  properly entered in~~                                                    ~~P&I Club~~ 497
497
~~and will so remain during the currency of this charter.~~ 498
~~When an escape or discharge of Oil occurs from the vessel and causes or threatens to cause Pollution~~ 499
~~Damage, or when there is the threat of an escape or discharge of Oil (i.e. a grave and imminent danger of the~~ 500
~~escape or discharge of Oil which, if it occurred, would create a serious danger of Pollution Damage) whether or~~ 501
~~not an escape or discharge in fact subsequently occurs), then Charterers may, at their option, upon notice to~~ 502
~~Owners or master, undertake such measures as are reasonably necessary to prevent or minimise such Pollution~~ 503
~~Damage or to remove the Threat, unless Owners promptly undertake the same. Charterers shall keep Owners~~ 504
~~advised of the nature and result of any such measures taken by them and, if time permits, the nature of the~~

FIRST ORIGINAL

measures intended to be taken by them. Any of the aforementioned measures taken by Owners shall be deemed taken at Owners' authority as Owners' agent, and shall be caused or contributed to by Charterers, then    507
   (1) any such escape or discharge or Threat was caused or contributed to by Charterers, or    508
   (2) by reason of the exceptions set out in Article III, paragraph 2, of the 1969 International    509
Convention on Civil Liability for Oil Pollution Damage Owners are or had the said Convention applied to such    510
escape or discharge or to the Threat would have been exempt from liability for the same, or    511
   (3) the cost of such measures together with all other liabilities, costs and expenses of Owners arising    512
out of or in connection with such escape or discharge or Threat exceeds one hundred and sixty United States    513
Dollars (US $160) per ton of the vessel's Tonnage or sixteen million eight hundred thousand United States    514
Dollars (US $16,800,000), whichever is the lesser, save and insofar as Owners shall be entitled to recover such    515
excess under either the 1971 International Convention on the Establishment of an International Fund or for    516
Compensation for Oil Pollution Damage or under CRISTAL.    517
   PROVIDED ALWAYS that if Owners in their absolute discretion consider said measures    518
should be discontinued, Owners shall so notify Charterers and thereafter Charterers shall have no right to    519
continue said measures under the provisions of this Clause 39 and all further liability to Charterers under this    520
Clause 39 shall thereupon cease.    521
   The above provisions are not in derogation of such other rights of Charterers or Owners may have    522
under this charter or may otherwise have or acquire by law or any International Convention or TOVALOP.    523
   The term TOVALOP means the Tanker Owners' Voluntary Agreement Concerning Liability    524
for Oil Pollution dated 7th January 1969, as amended from time to time, and the term CRISTAL means the    525
Contract Regarding an Interim Supplement to Tanker Liability for Oil Pollution dated 14th January 1971, as    526
amended from time to time; the terms "Oil", "Pollution Damage" and "Tonnage" shall for the purposes of this    527

Clause 39 have the meanings ascribed to them in TOVALOP. *Notwithstanding anything to the contrary in this charter, there shall be no obligation the owners or the vessel to be a participant in the tankers owners' voluntary agreement concerning liability for oil pollution dated January 7 1969 as amended (Tovalop). Owners, however, warrant that it is a member of the International Tanker Pollution Federation (ITOPF) and that owners will retain such membership during the entire period of the services of the vessel under this charter.*

Export
Restrictions
   40.  The master shall not be required or bound to sign bills of lading for the carriage of cargo to any place to    528
which export of such cargo is prohibited under the laws, rules or regulations of the country in which the cargo was    529
produced and/or shipped.    530
   Charterers shall procure that all bills of lading issued under this charter shall contain the following    531
clause:    532
    "If any laws, rules or regulations applied by the government of the country in which the cargo was    533
produced and/or shipped, or any relevant agency thereof, impose a prohibition on export of the cargo    534
to the place of discharge designated in or ordered under this bill of lading, carriers shall be entitled to    535
require cargo owners forthwith to nominate an alternative discharge place for the discharge of the    536
cargo, or such part of it as may be affected, which alternative place shall not be subject to the    537
prohibition, and carriers shall be entitled to accept orders from cargo owners to proceed to and    538
discharge at such alternative place. If cargo owners fail to nominate an alternative place within 72    539
hours after they or their agents have received from carriers notice of such prohibition, carriers shall be    540
at liberty to discharge the cargo or such part of it as may be affected by the prohibition at any safe place    541
on which they or the master may in their or his absolute discretion decide and which is not subject to the    542
prohibition, and such discharge shall constitute due performance of the contract contained in this bill,    543
of lading so far as the cargo so discharged is concerned."    544
   The foregoing provision shall apply mutatis mutandis to this charter, the references to a bill of lading    545
being deemed to be references to this charter.    546

Law and
Litigation
   41.  (a)  This charter shall be construed and the relations between the parties determined in accordance    547
with the laws of England.    548
    (b)  Any dispute arising under this charter shall be decided by the English Courts to whose    549
jurisdiction the parties hereby agree.    550
    (c)  Notwithstanding the foregoing, but without prejudice to any party's right to arrest or maintain    551
the arrest of any maritime property, either party may, by giving written notice of election to the other party, elect    552
to have any such dispute referred to the arbitration of a single arbitrator in London in accordance with the    553
provisions of the Arbitration Act 1950, or any statutory modification or re-enactment thereof for the time being    554
in force.    555
    (i)  A party shall lose its right to make such an election only if:    556
     (a)  it receives from the other party a written notice of dispute which –    557
      (1)  states expressly that a dispute has arisen out of this charter;    558
      (2)  specifies the nature of the dispute; and    559
      (3)  refers expressly to this clause 41(c)    560
and    561
     (b)  it fails to give notice of election to have the dispute referred to arbitration not later than    562
30 days from the date of receipt of such notice of dispute.    563
    (ii)  The parties hereby agree that either party may –    564
     (a)  appeal to the High Court on any question of law arising out of an award;    565
     (b)  apply to the High Court for an order that the arbitrator state the reasons for his award;    566
     (c)  give notice to the arbitrator that a reasoned award is required; and    567
     (d)  apply to the High Court to determine any question of law arising in the course of the    568
reference.    569
    (d)  It shall be a condition precedent to the right of any party to a stay of any legal proceedings in    570
which maritime property has been, or may be, arrested in connection with a dispute under this charter, that that    571
party furnishes to the other party security to which that other party would have been entitled in such legal    572
proceedings in the absence of a stay.    573

Construction
   42.  The side headings have been included in this charter for convenience of reference and shall in no way    574
affect the construction hereof.    575

*Clauses no.43 till no.52, both inclusive, at attached hereto, are deemed to be incorporated in and to form part of this charter party.*

This Charter Party is a computer generated copy of the SHELLTIME4 Charter Party form, printed using software which is the copyright of Strategic Software Limited.

This is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

OWNERS                                              CHARTERERS

Capt. E. SYRROS

FIRST ORIGINAL

# M/T ATLANTIC SOL

## Questionnaire 88

| | | | |
|---|---|---|---|
| 1. | GENERAL | | |
| 1.1 | VESSEL'S NAME | : | M/T ATLANTIC SOL |
| 1.2 | VESSEL'S PREVIOUS NAME(S) | : | ATLANTIC SUN / PACIFIC HARMONY |
| | FLAG | : | LIBERIAN |
| 1.4 | YEAR / WHERE BUILT | : | 1978 - MITSUI |
| 1.5 | DISPONENT OWNERS / BAREBOAT CHARTERERS | : | NIL |
| 1.6 | OWNERS | : | PIGASOS NAVIGATION CO., ;TD. |
| | OPERATORS | : | ESTORIL NAVIGATION LTD TEL. NO.:+30 210 4110512-4 FAX NO.: +30 210 4110515-6 TLX. NO. : 213980 VETA GR |

| | | | |
|---|---|---|---|
| 2. | PARTICULARS OF VESEEL | | |
| 2.1 | TYPE OF VESSEL | : | CRUDE OIL TANKER / PRODUCT CARRIER SBT - IGS - COW |
| 2.2 | DWT (FULL SUMMER DEATWEIGHT) | : | 69639 MTONS |
| 2.3 | FULL SUMMER DRAFT | : | 12,023 M |
| 2.4 | FREEBOARD ON FULL SUMMER DRAFT | : | 6,819 M |
| 2.5 | FREEBOARD IN SBT CONDITION | : | 11,44 M |
| 2.6 | GRT (GROSS REGISTER TONS) / NRT (NET REGISTER TONS ) | : | 43552 - 18655 ( IMO GRT ) : 34973 |
| 2.7 | SUEZ NRT | : | 42081 |
| 2.8 | PANAMA NRT | : | N/A |
| 2.9 | TPC (TON PER CENTIMETER), (OR TPI) ON SUMMER DWT | : | TPC = 74.7 MT / TPI = 186,3 LT |
| 2.10 | LOA (LENGTH OVER ALL) | : | 225.00 M |
| 2.11 | BEAM (EXTREME) | : | 37,80 M |
| 2.12 | PARALLEL BODY LENGTH IN LIGHT CONDITION | | 109,90 M ( SBT BALLAST) |
| 2.13 | KTM (DISTANCE KEEL - TOP OF MAST / HIGHEST POINT) | : | 48.8 M |
| 2.14 | CUBIC CAPACITY (98% EX SLOP TANK ) | : | 79566 CM |
| 2.15 | SLOP TANK(S) CAPACITY (98%) | : | 5092 CUBIC METERS |
| 2.16 | CARGO TANKS FULLY COATED / TYPE OF | : | NO |

24-05-2004  18:58  From-Estoril Navigation                    +302104110515      T-791  P.014/022  F-709

FIRST ORIGINAL  14.

COATING

| | | | |
|---|---|---|---|
| 2.17 | HEATING ARRANGEMENTS | : | ALL CARGO AND SLOP TANKS UP TO 57 C |
| 2.18 | SWL (SAFE WORKING LOAD) OF DERRICK / CRANE | : | 2 X 15 TONS |

3.  CARGO ARRANGEMENT

| | | | |
|---|---|---|---|
| 3.1 | NUMBER OF MANIFOLDS ON EACH SIDE | : | 3 |
| 3.2 | TYPE OF MANIFOLD | : | STEEL |
| 3.3 | DISTANCE BOW TO CENTER MANIFOLD | : | 112,6 M |
| 3.4 | DISTANCE DECK TO CENTER MANIFOLD | : | 920 mm |
| 3.5 | DISTANCE RAIL TO MANIFOLD | : | 5100 mm |
| 3.6 | NUMBER / SIZE OF REDUCERS | : | 3-12X10 / 3- 12X 8 / 2- 12X6 |
| 3.7 | NO. OF NATURAL SEGRECATION WITH DOUBLE VALVE | : | 3 |

4.  PUMPS

| | | | |
|---|---|---|---|
| 4.1 | PUMPS | : | 3 X 2000 CM/HR EACH,  STEAM  TURBINE |
| 4.2 | NUMBER OF CARGO PUMPS | : | 3 |
| 4.3 | CAPACITY OF CARGO PUMPS IN M3 WATER / H | : | EACH  2300  CM/HR |

5.  MOORING ARRANGEMENT

| | | | |
|---|---|---|---|
| 5.1 | NUMBER AND BRAKE HOLDING POWER OF MOORING WINCHES | : | 7 X 35 T |
| 5.2 | NUMBER / LENGTH / DIAMETER OF WIRES | : | 12 x220 m x 36 mm |
| 5.3 | BREAKING STRENGHT OF WIRES | : | 83.10 T |
| 5.4 | NUMBER / LENGTH / CIRCUMFERANCE OF MOORING ROPES | : | 22  X  220 M X 72.8 mm |
| 5.5 | BREAKING STRENGTH OF MOORING ROPES | : | 70.65 T |
| 5.6 | IS VESSEL EQUIPPED ACCORDING TO OCIMF'S STANDARD FOR SPM (SINGLE POINT MOORING) | : | YES |

6.  CLASSIFICATION SOCIETY, SURVEYS AND CERTIFICATE

| | | | |
|---|---|---|---|
| 6.1 | VESSEL'S CLASSIFICATION SOCIETY | : | ABS |
| 6.2 | LAST SPS (SPECIAL PERIODICAL SURVEY) | : | JUNE 2002 |
| 6.3 | LAST DRYDOCKING | : | JUNE 2002 |
| 6.4 | LAST AGS (ANNUAL GENERAL SURVEY) | : | JUNE 2003 |
| 6.5 | OWNERS WARRANT FOLLOWING CERTIFICATES TO BE VALID THROUGHOUT THE CHARTER PARTY PERIOD | : | |

FIRST ORIGINAL

- LOAD LINE                                              :  YES
- SOLAS SAFETY EQUIPMENT                                 :  YES
- SOLAS SAFETY CONSTRUCTION                              :  YES
- RADIO SAFETY                                           :  YES
- IOPP (INTERNATIONAL OIL POLLUTION                      :  YES
  PREVENTION )                                           :  YES
- USCG CERTIFICATE OF COMPLIANCE                         :  YES
- TOVALOP                                                :  YES
- FMC (FEDERAL MARITIME COMMISSION                       :  YES
- CLC (CIVIL LIABILITY CERTIFICATE)

7.       MISCELLANEOUS

7.1      NATIONALITY OF MASTER / OFFICERS / MAJORITY   :  GREEKS / FILIPINO
         OF CREW

7.2      P & I CLUB NAME                               :  THE AMERICAN P &I CLUB

7.3      NUMBER OF VESSELS IN DISPONENT OWNER'S        :  N/A
         FLEET

7.4      VESSEL'S CALL SIGN / TELEX -SATCOM NUMBER /   :  ELZW2 / 463694193 / SATCOM TEL:761636184-5
         FAX                                              FAX : 761636186

7.5      IF VESSEL HAS BEEN INVOLVED IN ANY SERIOUS    :  NIL
         POLLUTION INCIDENT THE LAST 12 MONTHS, FULL
         DESCRIPTION

7.6      IF VESSEL HAS BEEN INVOLVED IN ANY SERIOUS    :  NIL
         GROUNDINGS OR COLLISION THE LAST 12
         MONTHS, FULL DESCRIPTION

7.7      LAST THREE CARGOES (LAST / 2ND / 3RD )        :  ABADAN F.O.280cst / LAVAN STRAIT RUN F.O –
                                                          HSFO 380cst / ARABIAN LIGHT C.O.

         LOADING PORTS                                    BANDAR MAHSHAR / LAVAN – BAHRAIN /
                                                          RASTANURA

7.8      ANY OUTSTANDING DEFICIENCIES AS REPORTED      :  NIL
         BY ANY PORT STATE CONTROL ?

7.9      DOES THE VESSEL HAVE THE ``INTERNATIONAL      :  YES
         SAFETY GUIDE FOR OIL TANKER & TERMINALS``
         (ISGOTT) AND THE ICS / OCIMF ``SHIP TO SHIP
         TRANSFER GUIDE`` ON BOARD
7.10     OIL MAJORS APPROVALS                          :  SHELL – CHEVRONTEXACO / ABS CAP2

LAST  UPDATED  : 29TH  SEPTEMBER  2003
BY: CAPT. ELIAS  SYRROS

CHEM - TEAM S.r.l.                                              FIRST ORIGINAL

MT 'ATLANTIC SOL' TC 1/10/03 ACC FEIPCO
ADDITIONAL CLAUSES

43. Insurance: Owner to make sure that Insurance for usual is valid and covers:
    1.1 Hull and Machinery
    1.2 P&I Cover for USD 1 Billion
    1.3 ITOPF

44. Clean Ballast: Vessel to be delivered with clean ballast only

45. ISM Compliance Code: Owners undertake that from the date of coming into force of the International Management Code for the safe operation of ships and for pollution prevention (the International Safety Management (ISM) Code, (the "ISM code") on the 1st July 1998, and for the duration of this charter, the vessel and 'the company' (as defined in the Ism Code), shall comply with the requirements of the Ism Code. The Charterers require relevant documentation proof of compliance and /or safety management certificate within 6 working days from lifting subjects. In the event of a breach of the above undertaking any damage, expense or delay following therefrom shall be for owner's account.

46. IGS: Vessel to be fitted with operations IGS. If the cargo compartments are inherted, charterers or independent inspectors shall have the right to request the master to depressurize for the purpose of sampling, gauging, temperature determination and/or determination of the quantity of cargo remaining on board after discharge. Depressurization is to be conducted safely as described in the joint ICS/OCIMF publications 'International safety guide for oil tankers and terminal'' and the inert flue gas safety guide'' and consistent with port and/or terminal regulations at charterer's time/expense.

47. Pumping: Owners warrant vessel is capable of discharging her entire cargo within 24 hours excluding stripping and c.o.w. or maintaining average 100 Psi at the ship's manifold during the entire period of discharge provided shore facilities permit and vessel not restricted/interrupted from using all her lines/pumps, provided stated in voyage orders, if shore facilities request in writing. Reduced pumping pressure from the vessel for whatever reason, owners are to issue a letter of protest accordingly and have same signed by receivers/installation, if obtainable. Should the vessel /owners fail to comply with the provisions of this clause then all time lost will be for owner's account.

48. Crude Oil Washing: Owners warrant that the vessel is equipped with a crude oil washing system in good working order and that the master, officers and crew are competent to operate said system. If requested by charterers, owners agree to conduct crude oil washing in all cargo tanks at discharge port(s), to charterer's inspectors satisfaction. If crude oil washing is performed in all vessel's tanks the maximum time allowed to discharge the cargo as per the pumping clause will be increased by 11 hours. The oxygen content as measured in the cargo tanks prior to cow to be within local port and/or terminal regulations.

49. Owners advise that the vessel is able to clean up at least 30 pct of the cargo space for the receiving of a gasoil cargo but the whole procedure has to be carried out at charterer's time and expenses.

50. On-Off Hire Survey: On hire survey to be performed by charterers appointed surveyor at charterer's time/risk and expenses and time to count as used laytime. The delivery protocol to be

24-05-2004  18:59    From-Estoril Navigation                +302104110515      T-791  P.017/022  F-709

CHEM - TEAM S.                                   FIRST ORIGINAL

issued by the same surveyor including the rob bunker and the same to be countersigned by master of the vessel. Off-hire survey to be performed by charterers appointed surveyor at charterer's time/risk and expenses and time to count as laytime. The redelivery survey shall contain the rob bunker for redelivery. Master to act as owners surveyor for both surveys.

51. Any additional War Risk Insurance to be for charterer's account

52. Communication expenses: USD 1,000 Lumpsum per month back to the owners

28/10/2003 14.12

ESTORI/SQ
27-OCT-2003 22:54  FROM:MT ATLANTIC SOL 00973761636186        TO:00302104110515

21.

M/T ATLANTIC SOL
MONROVIA

PORT :"FUJAIRAH ANCHORAGE `A"
DATE : 28th OCTOBER 2003

CERTIFICATE OF DELIVERY
----------------------

THIS IS TO CERTIFY THAT ON OCTOBER 28th, 2003 AT 00:01 HRS LOCAL
TIME THE "M/T ATLANTIC SOL" OF LIBERIAN FLAG DELIVERED BY HER
OWNERS "PIGASOS NAVIGATION CO. LTD." TO Messrs "FAR EAST INTERNATIONAL
PETROLEUM COMPANY" AS THE CHARTERERS AT FUJAIRAH `A' ANCHORAGE AND IN
ALL RESPECTS SHE IS IN GOOD ORDER AND CONDITION AS PER RELEVANT
"FEIPCO TIME CHARTER PARTY DATED 01st OCTOBER 2003".

AT TIME OF DELIVERY BUNKERS REMAINED ON BOARD AS FOLLOWS:

IFO = 755.50 METRIC TONS
MDO = 133.10 METRIC TONS

THE ABOVE ARE TRUE AND CORRECT.

MASTER M/T ATLANTIC SOL

CHARTERERS REPRESENTATIVE

FUJAIRAH MARINE SERVICES & TRADING CO.(L.L.C.)

Mr.MICHAEL KRITIKAKIS
----------------------------------------
ACKNOWLEDGE RECEIPT AS OWNERS AGENT

EXHIBIT
B

🕐 11/19/2003 6:20 F                              🖼 ESTORI-64561        📄 001/001



# ESTORIL NAVIGATION LTD

61-65 Filonos Street, 1st floor, 185 35 Piraeus - GREECE
Tel.: 010-4110512-5 / 010-4220067-9 - Fax 010- 4110516 - Telex
241412 / 213980VETA GR - CABLES: "VETASHIP"
E-Mail: estoril@otenet.gr

From: Estoril Navigation - Account Department
Cc  : HOLMAN FENWICK & WILLAN
Date: Wednesday, November 19, 2003 6:20 PM +0200 Msg: ESTORI-64561
Sub : M/T ATLANTIC SOL - FEIPCO c/p dated 01.10.03

OUR REF.: AK/mk/13143

ATTENTION MR. LUCA DEMICHELLI

CC: MR. GEORGE J. TSIMIS
CC: MR. DIMITRI VASSOS

Dear Sirs,

### NOTICE  OF  WITHDRAWAL

WE REFER TO PREVIOUS CORRESPONDENCE WITH CHARTERERS AND THEIR CONTINUED
FAILURE TO PAY THE FIRST HIRE INSTALLMENT WHICH WAS DUE 3 DAYS BEFORE
THE VESSEL'S DELIVERY UNDER THE CHARTER.

KINDLY TREAT THIS AS OWNERS' NOTICE OF DEFAULT PURSUANT TO CLAUSE 9
(iii)(a) OF THE CHARTER PARTY.
FURTHER WE HEREBY NOTIFY CHARTERERS THAT UNLESS THEY RECTIFY THEIR
FAILURE TO PAY THE FIRST HIRE AND BUNKER INVOICE INSTALMENT IN ITS
ENTIRETY AS WELL AS INTEREST AS PRESCRIBED IN CLAUSE 9 (iii) (a) WITHIN
7 DAYS, I.E. BY CLOSE OF BUSINESS ON 26th, NOVEMBER OWNERS SHALL
WITHDRAW THE VESSEL FROM THEIR SERVICE.

OWNERS HEREBY RESERVE THEIR RIGHTS, CONTENTIONS AND REMEDIES UNDER THE
CHARTER PARTY OR OTHERWISE. PLEASE BE GUIDED ACCORDINGLY.

Kindly acknowledge and confirm same sent to the Charterers and they
acknowledged.

BEST REGARDS
ESTORIL NAVIGATION LTD



EXHIBIT

C

11/27/2003 3:39 PM ☎                    ☒ ESTORI-66066    🗎 003/003



*Far East Int. Petroleum Company*                شركة
                                الشرق الاقصى العالميه البتروليه ش م م

Date:        27th November 2003

To:          ESTORIL Navigation
Attention:   Mr. Karidopolous Alexander
Fax:         30 210 411 0516

Ref:         MT "Atlantic Sol" hire payment
             ─────────────────────────────

Further to our tele conversation this morning on the above captioned subject, and the concerns we have, that it is dragging on both sides. However, and to safe guard interests of both sides, we have accepted for the time being the Notice of Withdrawal until we make the first hire payment, upon which we will give "Atlantic Sol" at least 3-weeks notice to call on the C/P again.

The first hire payment is coming out of the proceeds of the L/C opened at our bank, which, will immediately after the Eid Holidays issue an Assignment of Proceeds, as a guarantee for the first hire payment.

As far as the mechanism of the L/C is concerned, will be negotiated within 12 days from N.O.R., intended to take place 5th of December 2003. We all admit that you have been kind enough and much generous in coping with our cash situation, but unfortunately the situation in Iraq had left a great Impact on our forecasts.

We still hope to keep the relations with you, as we are sure will over come this pit falls soon, and enjoy your co-operation as always extended to us.

With best regards.

Sincerely,


Mohamed SAADELDIN
Director, Marketing and
Business Development

صندوق بريد ٢٦٢٠الرمز البريدي١١٨٢١ عمان - الأردن - تلفون٢٣٣٠١/٢ ٥٥ فاكس ٥٥١١٤٣٧ ٥٥
P.O.Box 2620 Amman11821Jordan - Tel:5523301/2 Fax : 5511437
Email:Feipco@nets.com.jo

EXHIBIT

D